# EXHIBIT C-1

FILED
DALLAS COUNTY
2/15/2016 7:15:24 AM
FELICIA PITRE
DISTRICT CLERK

Freeney Anita

CAUSE NO. DC-16-01724 _____

| | | |
|---|---|---|
| **ARA R. DAYIAN, M.D., BUCKNER FAMILY MEDICAL ASSOCIATION, P.A. D/B/A PATIENT'S CHOICE FAMILY MEDICINE AND REHAB,** | §<br>§<br>§<br>§<br>§<br>§ | **IN THE DISTRICT COURT** |
| | | I-162ND |
| ***Plaintiffs***, | §<br>§ | ____ **JUDICIAL DISTRICT** |
| **v.** | §<br>§ | |
| **SEDGWICK CLAIMS MANAGEMENT SERVICES, INC., d/b/a SOUTHWEST MEDICAL PROVIDER NETWORK,** | §<br>§<br>§<br>§<br>§ | |
| ***Defendant.*** | § | **DALLAS COUNTY, TEXAS** |

## PLAINTIFFS' ORIGINAL PETITION

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** Plaintiffs Ara R. Dayian, M.D., Buckner Family Medical Association, P.A. d/b/a Patient's Choice Family Medicine and Rehab ("Plaintiffs"), and files this, their Original Petition against Sedgwick Claims Management Services, Inc. d/b/a Southwest Medical Provider Network ("Defendant" and/or "Sedgwick/Southwest") and, in support thereof, respectfully states as follows:

### DISCOVERY CONTROL PLAN

1.     In accordance with Rule 190.4 of the TEXAS RULES OF CIVIL PROCEDURE, Plaintiffs intend that discovery be conducted under Level 3.

<u>**STATEMENT OF RELATED CASE**</u>

2.      This case involves the same parties and a continuing dispute which was the subject of a lawsuit styled DC-14-13470, 162nd Judicial District of Dallas County, Texas, *Ara R. Dayian, vs. Sedgwick Claims Management Services, et al.*

<u>**PARTIES**</u>

3.      **Plaintiff ARA R. DAYIAN, M.D**., is an individual whose residence and principal place of business is in Dallas County, Texas.

4.      **Plaintiff BUCKNER FAMILY MEDICAL ASSOCIATION, P.A. D/B/A PATIENT'S CHOICE FAMILY MEDICINE AND REHAB** is a Professional Association doing business in Dallas County, Texas.

5.      Upon information and belief, **Defendant SEDGWICK CLAIMS MANAGEMENT SERVICES, INC., d/b/a SOUTHWEST MEDICAL PROVIDER NETWORK**, is a domestic corporation that is licensed by the Texas Department of Insurance and is actively conducting business under TDI Certificate Number 12062677 in Dallas County, Texas, with its principal place of business at 9601 McAllister Freeway, Ste 500, San Antonio, Texas 78216.  Defendant may be served with process in Texas through its registered agent, CT Corporation System, 1999 Bryon Street, Suite 900, Dallas, Texas 75201-3136.

<u>**JURISDICTION AND VENUE**</u>

6.      The Court has jurisdiction over the controversy in this matter because the amount in controversy is within the jurisdictional limits of the Court.

7.      Venue is proper in Dallas County, Texas, pursuant to Tex. Civ. Prac. & Rem Code §15.002(a) for the reason that the contract in question is to be performed in

Dallas County, Texas, all or a substantial part of the events, acts, omissions and transactions giving rise to Plaintiffs' claims and causes of action occurred in Dallas County, Texas, and because Defendant is actively conducting business in Texas and in Dallas County.

8.      This Court has personal jurisdiction over Defendant because upon information and belief:  (1) Defendant is a domestic entity actively conducting business in Texas and in Dallas County, Texas, and maintains a regular principal place of business in Texas; (2) the causes of action asserted in this case arose from and/or are connected with purposeful, fraudulent and tortious acts committed by Defendant and/or its co-conspirators, in whole or in part, in Texas and in Dallas County; (3) Defendant has committed various torts, directly and indirectly, in whole or in part, that caused substantial harm in Texas; and, (4) Defendant has had continuous and systematic contacts with Texas by engaging in regular and systematic business activities that have had an effect on this State.

9.      Pursuant to TEX. R. CIV. P. 47 Plaintiff seeks monetary relief over $1,000,000.00.[1]

## BACKGROUND FACTS

### A. THE FIRST LAWSUIT: DC-14-13470

10.      This is the second lawsuit involving the parties and the same subject matter. The first lawsuit was styled DC-14-13470, *Ara R. Dayian, vs. Sedgwick Claims Management Services, et al.* in the 162nd Judicial District of Dallas County, Texas. Plaintiff is a medical doctor licensed by the Texas Medical Board and is Board Certified

---

[1] Plaintiffs reserve the right to amend, decrease and/or increase the amount of damages plead based on evidence developed before trial.

by the American Board of Family Practice; a Texas Department of Insurance – Division of Workers' Compensation Designated Doctor; and a Diplomat of the American Academy of Pain Management.  The Defendant is a claims adjusting and provider network management company, which is supposed to ensure that injured worker's claims are handled in accordance with the Texas Law.  At the time the Plaintiffs' entered into the contract which formed the basis of the first lawsuit, DC-14-13470, and at all times material hereto, the Plaintiffs have practiced Family Medicine and Rehabilitation medicine throughout the DFW Metroplex.  The Plaintiff provides medical services to injured workers, many who are covered by a policy of workers' compensation insurance, as "in-network" contracted provider with Defendant.

11.    As was alleged in the first lawsuit, employer participation in the Texas workers' compensation insurance system is voluntary and exists as a legislatively sanctioned exchange of rights and duties between employer and employee.  At common law, employers were obligated to provide employees with a safe working environment.  Liability was by no means certain, but when a right to recover existed, damage awards to employees could be catastrophic.  Many injured employees, however, received no compensation.

12.    This precise risk and uncertainty led to the adoption of the Texas Workers' Compensation Act.  Under the Act, Employers who choose to provide workers' compensation coverage receive protection from injured employee liability claims. Employers who do not participate lose common-law defenses, such as comparative fault of the employee.  Thus, the system provides strong incentive for employer participation.

13.     In exchange for the loss of the right to sue the employer, the employee is provided a type of no-fault insurance coverage.  The employee receives all the care and medical treatment an occupational injury reasonably requires, but the employee receives very limited benefits for any other element of damage, such as impairment of earning capacity.

14.     It became clear almost immediately, following passage of the Act, that workers' compensation insurance plans could easily engage in "bad faith" insurance practices designed to cheat the employee of the benefit of the bargain.  The focus of most "bad faith" insurance schemes involved some means of representing that the employee would be entitled to lifetime medical treatment for on the job injuries.

15.     Unbeknownst to the employee, the insurance company could rig the system.  The employee could be sent to the "company doctor," who was paid to deny treatment and violate the duty the insurance company and the physician owed to a patient, by rigging the system to under-state the nature of an injury, under-treat the condition, and/or prematurely declare a patient able to return to work.  When the patient could not, he was fired.  Simply put, insurance companies could turn doctors into enemies of the patient with irreparable, catastrophic results.

16.     These "bad faith" practices led to a number of statutory and regulatory reforms mandating:  (1) the employee (not the insurance company) has the right to choose the doctor; (2) the employee is entitled to all necessary care which was codified in TEXAS LABOR CODE §§408.021 and 408.022.

17.     Effective September 1, 2005, the Texas Legislature enacted INSURANCE CODE §1305 which authorized the creation of workers' compensation Preferred

Provider Networks.   The Texas Department of Insurance recognized that workers'
compensation Preferred Provider Networks would once again provide an opportunity for
illegal insurance company interference in the physician-patient relationship.   The
Department of Insurance adopted rules to protect injured workers and physicians,
including 28 TAC Rule §§10.41-10.42 which specifies the contractual provisions that
must be included in every provider contract.

18.    On March 23, 2007, Plaintiffs applied and became a contracted Provider
in Defendant's Southwest Provider Network.

19.    As alleged in the first lawsuit, upon information and belief, Defendant
represented to employers, as part of marketing and sales information used to solicit the
sale of policies of insurance to employers of potentially injured workers, that an
employee could choose his own doctor without interference from the Defendant.   The
implication being that the Defendant would comply with all rules and laws applicable to
such policy of insurance.   One such statutory provision is the prohibition against
misrepresentation of policy terms or interference with the physician-patient relationship
found in TEX. INS. CODE §541.051 and §1301.067.

20.    As alleged in the first lawsuit, the provider Agreement by Insurance
Commission Rule must contain all of the mandatory contractual provisions required by
28 TAC §§10.41-10.42.   The law obligates the Defendant to comply with all provisions
of the TEX. INS. CODE and the TEXAS WORKERS' COMPENSATION ACT, LABOR
CODE TITLE 5, SUBTITLE A, the rules of the Insurance Commissioner or the
Commissioner of Workers' Compensation, as well as comply with all other applicable
laws of the State of Texas, including those statutory and common law principles

prohibiting "bad faith" insurance practices; breaches of the duty of good faith and fair dealing in workers' compensation contracts; engaging in unfair insurance practices in violation of TEXAS INSURANCE CODE §541.051; violations of the TEXAS DECEPTIVE TRADE PRACTICES ACT; engaging in unfair methods of competition in violation of TEX. INS. CODE §541.051; making misrepresentations regarding terms or benefits of a policy of insurance in violation of TEX. INS. CODE §541.051; engaging in unfair deceptive acts or practices in the business of insurance, both at common law and as contained in TEX. INS. CODE §541.051; engaging in violations of the corporate practice of medicine doctrine; interference with the relationship between the patient and physician or healthcare provider, both under the TEXAS MEDICAL PRACTICE ACT and TEX. INS. CODE §541.051, tortious interference with contract, violations of TEX. OCC. CODE 102.001, and other unlawful acts.

21.     As alleged in the first lawsuit, Plaintiffs invested great sums of capital and human resources in good faith reliance upon representations by Defendant as to the benefits, provisions, terms, and other requirements of Network Provider Status.  Under the Plan Agreement, Plaintiffs has always provided both the professional diagnosis, as well as therapy and rehabilitation services to injured workers covered by the Network.

22.     Upon information and belief, at some point during the term of the original contract (**Exhibit "A"**) Defendant struck a deal with another Network, MedRisk, to transfer Plaintiffs' patients without cause or proper notice.  Defendant informed Plaintiffs on November 3, 2014, that effective November 24, 2014, Defendant would be unilaterally severing the physician-patient relationship between Plaintiffs and Network employees, thereby depriving the employees of choice, forcing the Plaintiffs to

essentially abandon patients at a time of need, abandon some patients in the middle of treatment, because the Defendant is believed to have struck a deal to steer those patients through MedRisk to other providers.  This unilateral action would have resulted in irreparable injury, forever sever the physician-patient relationship between Plaintiffs and the injured employee/patient without providing appropriate notice to the patient, and deliver Plaintiffs' patients to a provider who was not the employee's choice.

23.    As alleged in the first lawsuit, a review of the original Agreement (**Exhibit "A"**) between the Plaintiffs and Defendant reveals the "bad faith" intentions of the Defendant.    Although the Agreement did in fact contain the mandatory contractual provisions required by 28 TAC §§10.41-10.42 (and in fact the first Agreement goes to great length to cite the inclusion of these mandatory provisions by citing the rule over twenty six (26) times), the first Agreement drafted by the Defendant then removes the statutorily mandated contractual provisions; stating effectively, that that no provision in the Agreement may be enforced by anyone for any reason.    In other words, the Defendant insurance company found a way to cheat the provider ("statute and patient be damned,")   out of these mandatory contractual protections, even though the Insurance Commissioner has mandated these contractual provisions be included in the Agreement for the protection of the public. "Bad Faith" is the only word which accurately describes such callous disregard for the rights of patients and providers.

24.    As alleged in the first lawsuit, the true purpose of the entire Arrangement was to engage in post-claims underwriting, with MedRisk as the conduit allowing Defendant to engage in the forbidden practice of steering injured employees to the "company doctor."  The more favored provider, on information and belief, would then be

expected to under-treat, under-diagnose, and openly disregard the statutory duty owed by the insurance company Defendant to physician and to the patient in violation, inter alia, of TEX. INS. CODE §§1305, 1301.067; 541.051 et. seq., and The Workers Compensation Act, TEX. LABOR CODE TITLE 5, SUBTITLE A.  If this is the case, such a consideration would violate the TEXAS ILLEGAL REMUNERATIONS ACT, TEX. OCC. CODE 102.001, et seq., and subject both the provider and the insurance company to criminal prosecution, disciplinary action, injunctions, and civil monetary penalties of up to $10,000.00 per day for each violation.

25.     As alleged in the first lawsuit, callous disregard for the rights of the patient would further expose Plaintiffs to a cause of action for Patient Abandonment. "Abandonment of a patient by a doctor" is one type of wrong which may give rise to a claim for malpractice.  'Abandonment,' when used in cases dealing with the physician-patient relationship, generally means the unilateral severance of the professional relationship between himself and the patient without reasonable notice at a time when there is still the necessity of continuing medical attention."  *See Lee v. Dewbre*, 362 S.W.2d 900 (Tex. Civ. App. 7th Dist. 1962); 57 A.L.R.2d 435, Section 1(d).

26.     This previous unilateral termination of the Plaintiffs with only a few days' notice (from November 3 to November 24) led to the first lawsuit.

27.     It was further alleged in the first lawsuit the arrangement between Defendant and MedRisk appears, on information and belief, to be a clear attempt to deprive injured employees the freedom to choose their doctor under Section 1305.104 of the Worker's Comp Network Act, which mandates that an injured employee be

entitled to his or her "first choice of a treating doctor from the list provided by the network" [emphasis added].

28.     The Workers' Comp Network Act sets forth guidelines and mandatory provisions for the contractual arrangements involved in a workers' compensation healthcare network.  Specifically, Section 1305.152(c) of the Workers' Comp Network Act sets forth mandatory provisions for contracts between a network and its healthcare providers.  28 TAC Rule 10.41-10.42 sets the requirements for termination of provider network status, including "a clause regarding appeal by the provider if termination of provider status,"… including provisions for "written notice to employees receiving care regarding such termination."

29.     Plaintiff would show that the events following the settlement of the first lawsuit are merely a continuing pattern and course of conduct designed to make a mockery of the laws of the state of Texas, to the harm and detriment of the public.

30.     It was also alleged in the first lawsuit, Defendant manufactured a subterfuge designed to convince the Plaintiffs that they had done something wrong in the performance under the Provider Agreement.  In reality, upon information and belief, Defendant wished to illegally steer patients to the "company's choice" of provider, not the patient's choice.

31.     As alleged in the first lawsuit, the original Provider Agreement identifies "Ara Robert Dayian, M.D." as synonymous with the defined term "Network Provider Group" used throughout the Agreement between the parties.  This indicates, upon information and belief, that the Defendant recognized that it was contracting with the entire group of individuals employed by Dr. Dayian.  The Group is the provider.  Dr.

Dayian is solely responsible for the group and may delegate to employees any act authorized by the Medical Practices Act.   Yet, an April 21, 2014 letter from Defendant to Plaintiffs noted that a list of employees had not yet been fully credentialed by the Network.  This was confusing because the Medical Practices Act grants discretion to the Plaintiffs, not the Defendant, whether to delegate functions under the contract to an employee.   Further, separate credentialing is not required under TITLE 22, TEXAS ADMINISTRATIVE CODE RULE 10.82.  Instead, Rule 10.82 provides that employees should be credentialed if they are listed on the provider network directory.  There was no allegation in the letter that anyone who was not credentialed was listed on the Provider Network Directory.   The Defendant's stated objection, on information and belief, was not valid or even remotely valid.   There is no provision in the Provider Agreement covering this matter.   Rule 10.82 also requires that the procedure must be clearly given to the provider by the Network if mid-levels are expected to be credentialed by the Network.   Rule 10.82 states that the Network must notify the provider of the policy.   [Emphasis added] Thus, due process under the workers' compensation scheme requires notification of the exact policy, notification of breach of such policy by the Network (which should also include identification of the actual policy itself) and present an opportunity to cure.

32.     To this end, counsel for Dr. Dayian wrote to the Network on May 27, 2014, pledging to work with Sedgwick/Southwest to rectify any concerns, but that Dr. Dayian did not understand what the policy might be, or how he might have violated it.   The letter asked that if the Network had a change in policy, to please let Dr. Dayian know

and he would be happy to correct any deficiencies.   However, neither Plaintiffs nor counsel received any reply, notice, or further complaint in response to this letter.

33.     As alleged in the first lawsuit, Plaintiffs was not notified by Defendant until August 20, 2014, that his contract was being terminated and that the injured workers would be deprived of their first choice of provider.   Furthermore, the August 20, 2014 Notice did not state a reason for the termination.   Plaintiffs were not given any instructions by the Network as to what might possibly be required for compliance. There is no indication that employees were given an opportunity to object.

34.     As alleged in the first lawsuit, the surprise termination letter gave Dr. Dayian one (1) day, until August 21, 2014, to notify the Network of a request for extension and an internal, "rubber stamp" review panel.   Dr. Dayian met the deadline and under the terms of the letter, requested a three doctor panel to review the matter. The letter further advised that the Network would not notify the patients, nor terminate, until the three doctor panel made its decision.   The letter indicated that the three doctor "rubber stamp" panel would convene and decide the permanence of the termination within the original time-frame of the extension, which was November 24, 2014.   Thus, again, Dr. Dayian has been provided a "rubber stamp" review, although he has done nothing wrong, but no notice and opportunity to correct the alleged deficiency was provided prior to or after this appeal.

35.     Instead, the Network review panel "rubber-stamped" its own conclusion and notified the Plaintiffs of the result on November 3, 2104.   The surprise termination by Defendant of Plaintiffs from the Network without cause, without sufficient notice, and in violation of the agreement with Plaintiffs and state law, if allowed to stand, would

result in irreparable injury to the Plaintiffs and the patients who have chosen Plaintiffs in good faith reliance upon Defendant's representations.

36.     As alleged in the first lawsuit, the Network's action in attempting to terminate Plaintiffs from its Network was arbitrary, capricious and in violation of the agreement between the Defendant and Plaintiffs.  The Workers' Compensation Network Act provides for only a single basis for rejecting a physician's application to become part of a workers' compensation health care network when "the network has contracted with a sufficient number of qualified health care providers."   TEX. INS. CODE §1305.152.  Further, the Legislature mandated an appeal process for any attempt to terminate a healthcare provider, and such process would be rendered meaningless if "without cause" terminations were to be permitted.  Id. at subsection (c)(4).

37.     As alleged in the first lawsuit, the Defendant further violated the provisions of 28 TAC § 10.41-42 which requires all Network Carrier Contracts to contain specific provisions set forth in Rules 10.41-42.  While the Provider Agreement does contain the required provisions, in fact, the Agreement references 28 TAC § 10.41-42 a total of twenty six (26) times, the Defendant then brazenly defies the law requiring the inclusion of contract protections with the following disclaimer of the mandatory contract rights:

> 5.4  Indemnification.  Each Party agrees that the other party . . . shall not be liable for any awards, lawsuit damages, penalties, specific performance obligations, costs, expenses, or any other losses or obligations of any kind related to the other party's obligations herein and each Party shall indemnify and hold harmless the other party from and against any and all losses, claims, causes of action, actions, liabilities, damages, costs and expenses . . . arising from and in connection with, or pertaining in any way to these obligations.

38.     As alleged in the first lawsuit, the Defendant included the contract provisions required by the Insurance Commissioner, then brazenly disclaimed any

liability under the contract.   This attempted exculpatory language written by the Defendant would indicate that the Defendant had no intention of fulfilling its contractual promises at the time the promises were made, as required by and made a condition of the Agreement by the Texas Board of Insurance.

39.     The district court entered a Temporary Restraining Order in the first lawsuit, and the parties agreed to mediate the dispute.   Mediation was successful, and the parties entered into a mediated settlement Agreement (**Exhibit "D"**).

THIS (THE SECOND) LAWSUIT.

40.     After the settlement agreement was entered, the parties then entered into a new Provider Group Agreement for Occupational Injury on March 18, 2015. (**Exhibit "E"**) The agreement was for a term of one year. As the anniversary date approached, the Defendant notified the Plaintiffs that the Agreement would not be renewed. The date of this letter was December 3, 2015.

41.     As with the "indemnity" provision, Defendant had no intention of fulfilling its contract.   Plaintiffs would show that the Defendant fraudulent represented that the Plaintiffs would be accepted into the Provider network, when in fact the Defendant had no intention of permanently resolving the disputed allegations made in the first lawsuit. Defendant's sole objected was the dismissal of the first lawsuit, and the avoidance of discovery which would have shown the anti-competitive nature of Defendant's schemes which were violative of Texas law.

42.      Plaintiffs would further show that Defendant cannot launder or wash clean its continuing course of illegal conduct, nor prevent discovery into Defendants

conspiracy to violate Texas law by use of a sham settlement agreement and token one-year agreement, which on information and belief, Defendant never intended to renew.

## CAUSES OF ACTION

**BREACH OF CONTRACT**

43.     Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

44.     Defendant breached the first Agreement, entered into a settlement agreement allowing Plaintiffs back into the network on condition that the Plaintiffs dismiss the first suit,  and then fraudulently entered into a "sham" second Agreement, which Defendant never intended to renew in order to defraud the Plaintiffs out of the expectation rights negotiated in the mediated settlement agreement in the first lawsuit.

45.     Defendant's breaches of the first Agreement and settlement Agreement as set forth above will proximately cause actual, consequential and special damages to Plaintiffs in an amount exceeding the jurisdictional limits of the Court.   Furthermore, Plaintiffs seeks his attorneys' fees incurred as a result of such breaches pursuant to TEX. CIV. PRAC. REM. CODE §38.001, et seq.

46.     All conditions precedent necessary for Plaintiffs to recover for Defendant's breaches of the Agreement have occurred or have been performed.

**TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS**

47.     Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

48.     The Plaintiffs had a valid contract represented by the first Agreement and an expectation founded in the settlement Agreement. Plaintiffs was fraudulently led to

believe that Plaintiffs had settled the dispute and would be back "in network" in the settlement of the first Lawsuit.  It appears that the second provider Agreement was a Sham.

49.     Defendant, upon information and belief, willfully and intentionally conspired with MedRisk or others, to interfere with the first provider Agreement and the rights obtained in the mediated Settlement Agreement in the first lawsuit.

50.     The interference proximately caused the Plaintiffs' injury, past and future.

51.     The Plaintiffs has incurred actual damage and loss.

52.     Virtually any type of contract is sufficient as the foundation of an action for procuring its breach.  Even an unenforceable contract may serve as the basis for a tortious interference claim if the contract is not void.   *Juliette Fowler Homes, Inc. v. Welch Associates, Inc.,* 793 S.W.2d 660, 664 (Tex. 1990) (Terminable at-will contracts may also serve as the basis for an action for tortious interference with contract). *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989).

**TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS**

53.     Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

54.     There was a reasonable probability that the Plaintiffs would have entered into a business relationship with third persons, namely, injured employees seeking a health care provider under the Network.

55.     Defendant intentionally interfered with such relationships.

56.     Defendant's conduct was independently tortious or unlawful;

57.     The interference proximately caused the Plaintiffs' injury.

58.     The Plaintiffs suffered actual damage or loss.

**BREACH OF FIDUCIARY DUTY**

59.     Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

60.     Defendant owed fiduciary duties to Plaintiffs and to the patient/injured employees.   As a result of its unlawful acts and conduct, Defendant breached the following fiduciary duties:

a.      duty of candor;

b.      duty to refrain from self-dealing;

c.      duty to act with integrity of the strictest kind;

d.      duty of full disclosure on all matters affecting the Network;

e.      duty of loyalty, utmost good faith, fairness and honesty in dealing with a qualified health care provider on matters pertaining to the Network; and

f.      violating the duty against "patient abandonment."

61.     Defendant's breach of its fiduciary duties resulted in injury to the Plaintiffs and/or benefits itself.  Plaintiffs have been damaged by the unlawful acts and conduct of Defendant.   The damages suffered by the Plaintiffs were a foreseeable result of Defendant's breach of its fiduciary duties.

62.     Plaintiffs seek all actual, consequential, and incidental damages that have resulted from Defendant's breaches of its fiduciary duties.  Further, the Plaintiffs seek forfeiture and disgorgement of all benefits that have been received by Defendant as a result of these breaches of fiduciary duties owed to Plaintiffs.

**NEGLIGENT MISREPRESENTATION**

63.     Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

64.     Defendant made a representation to the Plaintiffs in the course of Defendant's business or in a transaction in which Defendant had an interest.

65.     Defendant supplied false information for the guidance of others.

66.     Defendant did not exercise reasonable care or competence in obtaining or communicating the information.

67.     The Plaintiffs justifiably relied on the representation.

68.     Defendant's negligent misrepresentation proximately caused the Plaintiffs' injury.

**FRAUD**

69.     Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

70.     Defendant entered into a Settlement Agreement which resolved the first lawsuit, which the Defendant represented would allow the Plaintiffs to remain in network. Plaintiffs relied upon this representation in agreeing to drop the first lawsuit. The Defendant's representation was illusory and false when made, for the Defendant had no intention of allowing the Plaintiffs to remain in network, but merely misled the Plaintiffs in order to avoid discovery in the first lawsuit. Further, the indemnity language renders the contract illusory.  The Second network Provider Agreement was merely a "sham" agreement. Defendant's representations were false when made, were relied upon by the Plaintiffs to his detriment, and Plaintiffs suffered damages thereby.

**NEGLIGENCE**

71.     Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

72.     Defendant owed a legal duty to the Plaintiffs.

73.     Defendant breached the duty.

74.     The breach proximately caused the Plaintiffs' injury.

**DECLARATORY JUDGMENT**

75.     Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

76.     Plaintiffs will show that a present controversy exists.   Accordingly, pursuant to the Declaratory Judgment Act, Section 37.001 et seq., of the TEX. CIV. PRAC. & REM. CODE, Plaintiffs requests that this Court enter a declaratory judgment establishing that the termination of Plaintiffs "without cause" from the Network is not allowed, incompatible with, and unlawful under, Chapter 1305 of the TEXAS INSURANCE CODE and, therefore, Defendant's attempted termination of Plaintiffs from the Network is void.   Plaintiffs request that this Court enter a declaratory judgment declaring that the Indemnification paragraph in the Agreement (**Exhibit "E"**), Page 6, ¶ 5.4) is void.   Plaintiffs request this Court enter a declaratory judgment that the Agreement does not provide for "without cause" terminations under the Network and that Defendant has failed to provide proper, timely, and sufficient notice of any attempted termination from the Network.   Plaintiffs request this Court enter a declaratory judgment that Defendant may not use an improper purpose under Chapter 1305 or under the Agreement to attempt to terminate the Plaintiffs under the Agreement.

77.     Plaintiffs request this Court enter a declaratory judgment that the Settlement Agreement (**Exhibit "D"**) and the subsequent Provider Agreement permitting the Plaintiffs to remain in network, were "sham" Agreements intended to deprive the public of a right guaranteed by the Texas legislature, and therefore voidable as against public policy and a violation of Texas statutes.

78.     Plaintiffs has been forced to hire the law firm of Friedman & Feiger, LLP, to prosecute this declaratory judgment action against Defendant and, thus, pursuant to §37.009 of the Declaratory Judgment Act, may request that this Court award Plaintiffs costs and reasonable and necessary attorneys' fees that are equitable and just. Accordingly, Plaintiffs sues for an award of its reasonable and necessary attorneys' fees and costs with respect to this count.

**ATTORNEYS' FEES**

79.     Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

80.     Plaintiffs have made demand upon Defendant thirty (30) days prior to the trial of this cause for payment of damages.  As a result of Defendant's failure to comply, Plaintiffs has been required to employ the services of Friedman & Feiger, LLP, to prosecute this action.  Accordingly, Plaintiffs is entitled to an award of his reasonable and necessary attorneys' fees incurred in the prosecution of this action pursuant to TEX. CIV. PRAC. & REM. CODE ANN. §§37.009 and 38.001, et. seq., for which sums Plaintiffs hereby sue Defendant, jointly and severally.

**EXEMPLARY DAMAGES**

81.     Plaintiffs incorporate by reference all of the allegations in each of the paragraphs above as if fully set forth herein.

82.     Plaintiffs will show that as with respect to counts above, Defendant acted with malice or gross negligence and that accordingly, an award of punitive or exemplary damages in an amount to be determined by the trier of fact is justified.

**JURY DEMAND**

83.     Plaintiffs hereby demand trial by jury for all issues which are triable to a jury.

**REQUEST FOR DISCLOSURE**

84.     Please take notice that pursuant to Rule 194 of the TEXAS RULES OF CIVIL PROCEDURE, Defendant is hereby requested to disclose the information or material described in Rule 194.2 within the time required by TEXAS RULE OF CIVIL PROCEDURE 194.3(a).

85.     In the event that your response to this Request requires the production of voluminous documents, Friedman & Feiger, LLP, would request that the responsive documents be produced for inspection and/or reproduction in the offices of the undersigned attorneys.   Pursuant to Rule 193.7 of the TEXAS RULES OF CIVIL PROCEDURE, you are hereby advised that the production of documents in response to this Request operates to authenticate documents produced such that they may be used against you in any pretrial proceeding or at trial unless you timely and properly object to the authenticity of the documents in accordance with Rule 193.7 of the TEXAS RULES OF CIVIL PROCEDURE.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs Ara R. Dayian, M.D., prays that Defendant be cited to appear and to answer  and that upon final hearing, the Court enter judgment in favor of Plaintiffs Ara R. Dayian, M.D., against Defendant in an amount in excess of the minimum jurisdictional limits of this Court for actual, special, consequential and punitive damages, reasonable attorneys' fees, reasonable paralegal fees, costs of court, and pre-and post-judgment interest at the highest rate allowed by law, and a declaratory judgment declaring that Plaintiffs' termination from the Network without cause is not lawful under the TEXAS INSURANCE CODE, and for such other and further relief at law or in equity, to which Plaintiffs may show themselves to be justly entitled.

Respectfully Submitted,

/s/ Jason H. Friedman

By: _____

**Lawrence J. Friedman**
State Bar No. 07469300
lfriedman@fflawoffice.com
**Jason H. Friedman**
State Bar No. 24059784
jhfriedman@fflawoffice.com

**FRIEDMAN & FEIGER, L.L.P.**
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972) 788-1400 (Telephone)
(972) 788-2667 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**



## SOUTHWEST MEDICAL PROVIDER NETWORK
## PROVIDER SERVICE AGREEMENT

### Provider Group
### Occupational Injury

This Agreement is made this __33__ day of __March__ _____,200*7* by and between SouthWest Medical Provider Network, (hereinafter referred to as the "Network") __ARA Robert Dayian, M.D.__ _____ (hereinafter referred to as the "Network Provider Group").

WHEREAS, the Network is a Texas for-profit corporation organized for the purpose of arranging for the provision of health care to employer groups, insurers, and other payers in a timely and efficient manner consistent with good medical practice; and

WHEREAS, the Network will from time to time enter into contracts with employer groups, insurers, and other payers for the provision of health care services, the Network does not practice medicine in any form and is not responsible for patient outcomes as a result of its contractual agreement with Network Provider Group. The Network Administration shall not attempt, directly or indirectly, to control, direct or interfere with the practice of medicine by any Network Provider Group; nor shall the Network Administration authorize such control, direction or interference by any other party; and

WHEREAS, the Network Provider Group desires to provide quality and cost-effective health care services to individual participants in health benefit programs (hereinafter referred to as "Network Patients") of employer groups, insurers, and other payers under contract with the Network;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the parties agree as follows:

## I.    DEFINITIONS

When used in this Agreement and unless the content otherwise clearly requires, the following words and terms shall mean:

1.1    COVERED SERVICES:

Medical services that are authorized for payment under the employer's, insurer or payer's occupational injury program.

1.2    NETWORK FACILITIES: Any health care facility including but not limited to ambulatory surgical facilities, acute care hospitals, nursing homes, outpatient clinics, etc., which have contracted with the Network to render Covered Services to Plan Patients.

1.3    NETWORK GOVERNING BOARD:

The Board of Directors of SouthWest Medical Provider Network.

RECEIVED

APR 0 2 2007

CMI-SA

1



EXHIBIT
A

1.4     NETWORK HOSPITAL:

A licensed hospital in the State of Texas which has contracted with the Network to render Covered Services to Plan Patients.

1.5     NETWORK UTILIZATION REVIEW COMMITTEE:

A representative group of Network Providers, drawn from the medical specialties practiced by Network Providers, appointed by the Network to advise the Network on the medical aspects of the Network's business and to recommend and review standards with regard to the quality and appropriateness of medical care rendered to Network Patients.

1.6     NETWORK PROVIDER

Any Provider licensed to practice in the State of  who has contracted with the Plan to render Covered Services to Network Patients.


## II.     NETWORK PROVIDER GROUP RESPONSIBILITIES

2.1     The Network Provider Group agrees to follow treatment guidelines, return-to-work guidelines and individual treatment protocols adopted by the network pursuant to 10.405 of Subchapter C – Contracting from the Workers' Compensation Health Care Network Rules posted by TDI (relating to Guidelines and Protocols), as applicable to an employee's injury. **TAC §10.42 (b)(2)**

2.2     The Network Provider Group agrees to accept as payment in full for providing Covered Services to Network Patients reimbursement of the total covered services as specified in Attachment A (occupational injury, reimbursement schedule) **TAC §10.42 (b)(11)** and will not bill the patient or attempt to collect any amounts of payment from an employee for health care services for compensable injuries under any circumstances, including the insolvency of the insurance carrier, employer or the Network. **TAC §10.42 (b)(1)**

2.3     The Network Provider Group, who's specialty has been designated by the Network as a treating doctor, agrees to be a Network Treating Doctor and, if so, any additional provisions applicable to the Network Provider Group. **TAC §10.42 (b)(12)**

2.4     The Network Provider Group who's specialty has been designated by the Network as a treating doctor and/or specialist in the Network must be available 24 hours per day, seven days per week within the Network's service area. Availability may be established by telephone answering service, pager, or indirectly by telephone. The Network Provider Group may direct employees to urgent care centers or emergency rooms if the Network Provider Group judges such sites to be the appropriate location for care pursuant to §1305.302(b)

2.5     Billing by and payment to the Network Provider Group will be made in accordance with Labor Code 408.027 and other applicable statutes and rules. **TAC §10.42 (b)(13)**

2.6     When submitting claim forms for Network Patients, the Network Provider Group agrees to use appropriate procedure codes and HCFA forms to identify services rendered to Network

2

RECEIVED

APR 02 2007



Patients as defined by the standards of CPT-4 and ICD-9-CM, or other procedure coding systems utilized by the Network.

2.7     The Network Provider Group agrees to maintain a current license to practice in the State of Texas and agrees to render Covered Services to Network Patients.

2.8     The Network Provider Group agrees to allow the Network to list the Network Provider Group's name, address and phone number in a directory of Network Providers to help promote the Network with employer groups, insurers, and other payers. Any other use of Network Provider Group's name requires prior approval by Network Provider Group.

2.9     The Network Provider Group agrees to carry either occurrence-based or claims-made general and professional liability insurance at the Network Provider Group's expense in an amount that is normally required, to cover claims made by Network Patients or others in connection with the performance of any part of this agreement. The Network Provider Group will furnish the Network with the name of the Network Provider Group's insurance carrier and agrees that the Network may confirm such insurance coverage is adequate and in force through the term of this Agreement. The Network Provider Group will allow the Network access to the insurance carrier data and information on the Network Provider Group's medical malpractice history including the number, type, nature, and disposition of claims filed against the Network Provider Group. The Network Provider Group will notify the Network promptly whenever a Network Patient files a claim or a notice of intent to commence action against the Network Provider Group.

2.10    The Network Provider Group understands and agrees that, in the provision of medical care services under the Agreement, the Network Provider Group acts as an independent contractor and not as an employee or agent of the Network.

2.11    Nothing in the Agreement shall be construed to restrict the Network Provider Group from entering into other contracts or agreements to provide health care services to other health care delivery plans, patients, or employer groups.

2.12    Network Provider Group agrees to post in the office of Network Provider Group a notice to employees on the process for resolving worker's compensation health care Network complaints in accordance with Insurance Code 1305.405. The notice must include the department's toll-free telephone number for filing a complaint and must list all workers' compensation health care networks with which the Network Provider Group contracts. **TAC §10.42 (b)(7)**

2.13    The Network Provider Group and any subcontract within the Provider Network shall not be interpreted to involve a transfer of risk as defined under Insurance Code 1305.004(a)(26). **TAC §10.42(b)(9)**

2.14    The Network Provider Group and any subcontracting provider within the Network must comply with all applicable statutory and regulatory requirements under federal and state law. **TAC §10.42 (b)(10)**

2.15    The Network agrees to furnish to the Network Provider Group and the Network Provider Group agrees to abide by the list of any treatments and services that require the Network's preauthorization and any procedures to obtain preauthorization. **TAC§10.42(b)(8)**

RECEIVED

APR 02 2007

CMI-SA

32



2.16    The Network Provider Group specifically agrees to provide treatment for injured employees who obtain workers' compensation health care services through the Network that is specifically identified in the contract as a contracting party. TAC §10.42 (b)(14)

2.17    The Network Provider Group agrees to refer injured employees to in-network providers only and must first contact Network for out of network approval.

## III.    NETWORK RESPONSIBILITIES

3.1    The Network is not required to accept an application for participation in the Network from a health care provider that otherwise meets the requirements specified in this chapter if the network determines that the network has contracted with a sufficient number of qualified health care providers, including health care providers of the same license type or specialty. TAC §10.42(a)

3.2    The Network agrees to contract with employer groups, insurers and other payers and will strive that such groups pay the Network Provider Group's occupational injury claims promptly within forty five (45) or fewer calendar days of receipt of the Network Provider Group's billing for Covered Services rendered to Network Patients.

3.3    The Network agrees to perform or arrange for the performance of such administrative, accounting, and other related functions necessary to implement and operate the Network.

3.4    The Network agrees to provide Network Provider Group with a toll free number to assist Network Provider Group in verifying the status of Network Patient.

3.5    The Network agrees to market the Network to and enter into contracts with employer groups, insurers, other payers and claims administrators.

3.6    The Network agrees to use its best efforts to contract with sufficient Network Provider Groups and Network Facilities to allow the Network Patients reasonable access to appropriate medical services within the service area.

3.7    The Network agrees to describe to employer groups, insurers, and other payers the terms and conditions under which the Network Provider Group will provide health care services as a participating Network Provider Group of the Network

3.8    The Network agrees to furnish to the Network Provider Group, and the Network Provider Group agrees to abide by, the list of any treatments and services that require preauthorization and any procedures to obtain preauthorization. TAC §10.42 (b)(8)

3.9    The contract and any subcontract within the Network shall not be interpreted to involve a transfer of risk as defined under Insurance Code 1305.004(a)(26). TAC §10.42 (b)(9)

3.10    The Network shall not use any financial incentive or make a payment to a health care provider that acts directly or indirectly as an inducement to limit medically necessary services. The adoption of treatment guidelines, return to work guidelines and individual treatment protocols by a network under Insurance Code 1305.304 and 10.83(a) of this chapter (relating to Guidelines and Protocols) is not a violation of this section. TAC §10.42 (c)

4

RECEIVED

APR 02 2007

JMI-SA

33

3.11   An insurance carrier or Network must provide written notice to a Network Provider or group of Network Providers before the carrier or Network conducts economic profiling, including utilization management studies comparing the Network Provider to other providers, or other profiling of the Network Provider or group of Network Providers. **TAC §10.42(d)**

3.12   The insurance carrier or Network may not deny treatment solely on the basis that a treatment for a compensable injury in question is not specifically addressed by the treatment guidelines used by the insurance carrier or Network. **TAC §10.42 (b)(3)**

3.13   The Network will not engage in retaliatory action, including termination of or refusal to renew a contract, against a provider because the provider has, on behalf of an employee, reasonably filed a complaint against, or appealed a decision of the Network or requested reconsideration or independent review of an adverse determination. **TAC (b)(4)**

## IV.   TERM AND TERMINATION

4.1   The term of the Agreement is for one (1) year, and it shall automatically renew from year to year thereafter unless terminated as provided herein.

4.2   If a Network Provider Group leaves the Network, upon the Network Provider Groups' request, the insurance carrier or Network is obligated to continue to reimburse the Network Provider Group for a period not to exceed 90 days at the contracted rate of care of an employee with a life-threatening condition, or an acute condition for which disruption of care would harm the employee; **TAC §(b)(5)(A)**

4.3   A dispute concerning continuity of care shall be resolved through the dispute resolution process under Insurance Code 1305.401-1305.405 and SubChapter G of the chapter (relating to Complaints). **TAC§10.42(b)(5)(B)**

4.4   Appeal by the Network Provider Group of termination of Network Provider Group status, except for termination due to contract expiration, and applicable written notification to employees receiving care regarding such a termination, including requirements that: **TAC §10.42 (b)(6)**

(A)   The Network must provide notice to the Network Provider Group at least 90 days before the effective date of a termination; **TAC §10.42 (b)(6)(A)**

(B)   Network must provide an advisory review panel that consists of at least three providers of the same licensure and the same or similar specialty as the Network Provider Group. **TAC §10.42 (b)(6)(B)**

(C)   Upon receipt of the written notification of termination, a Network Provider Group may request a review by the Network's advisory review panel not later than 30 days after receipt of the notification; **TAC §10.42 (b)(6)(C)**

(D)   The Network must complete the advisory panel review before the effective date of the termination; **TAC §10.42 (b)(6)(D)**

5

RECEIVED

APR 02 2007

34

(E)     The Network may not notify patients of the termination until the earlier of the effective date of the termination or the date the advisory review panel makes a formal recommendation; **TAC §10.42 (b)(6)(E)**

(F)     In the case of imminent harm to patient health, suspension or loss of license to practice, or fraud the Network may terminate the Network Provider Group immediately and must notify employees immediately of the termination and; **TAC §10.42 (b)(6)(F)**

(G)     If the Network Provider Group terminates the contract, the Network must provide notification of the termination to employees receiving care from the terminating Provider Group. The Network shall give such notice immediately upon receipt of the Network Provider Group's termination request or as soon as reasonably possible before the effective date of termination **TAC §10.42 (b)(6)(G)**

## V.     GENERAL

5.1     This Agreement shall bind and benefit the Network Provider Group hereto and either party without the prior written consent of the other party, which shall not be unreasonably withheld, may not assign their respective successors or assigns, but it.

5.2     The section headings used herein have been inserted for convenience of reference only and shall not in any way modify or restrict any of the terms or provisions hereof.

5.3     Confidentiality - Each party shall be subject to all applicable laws and regulations concerning confidentiality of patient medical records and confidentiality of Network reimbursement schedule.

5.4     Indemnification - Each party agrees that the other party, and its respective directors, employees, agents, subsidiaries, and successors and assigns shall not be liable for any awards, lawsuit damages, penalties, specific performance obligations, costs, expenses, or any other losses or obligations of any kind related to the other party's obligations herein, and each party shall indemnify and hold harmless the other party from and against any and all losses, claims, causes of action, actions, liabilities, damages, costs and expenses (including without limitation reasonable legal fees), whether known or unknown, arising from, in connection with, or pertaining in any way to these obligations.

5.5     Independent Contractor - None of the provisions of this Agreement are intended to create, nor be construed to create, any relationship between either party other than that of independent contractors contracting with each other solely for the purpose of carrying out the provisions of this Agreement. Neither of the parties hereto nor any of their respective trustees, officers, employees, consultants, attorneys, accountants, administrative officers, or agents shall be construed to be the agent or employee of the other.

5.6     Governing Law - This agreement shall be deemed to have been executed in Texas and shall be construed and enforced in accordance with the laws of the State of Texas without giving effect to principles of conflict of laws.

5.7     Waiver - The failure of any party to this Agreement to object to, or take affirmative action with respect to, any conduct of the other which is in violation of the terms of this

RECEIVED

APR 02 2007



Agreement shall not be construed as a waiver thereof or of any future breach or subsequent wrongful conduct.

5.8   Entire Agreement - This agreement, including any attached Exhibits, constitutes the entire understanding between the parties concerning its subject matter. All prior negotiations and agreements of the parties with respect to any of the duties and obligations set forth in this agreement are merged into this agreement.

7

RECEIVED

APR 02 2007

36

Executed this _23_ day of _MArch_ , 2007

By:  Network Provider Group

_ARA Robert DAyian, M·D._
Provider's Name (Please Print)

_____
Signature

_5508 Brentwood Stair Rd._
Mailing Address

_Fort Worth, TX 76112_
City, State, Zip

Tax I.D. # _41-2109364_          Date: _3/23/07_


By:      SouthWest Medical Provider Network
         613 NW Loop 410, Ste 800
         San Antonio, TX  78216


_____Sally Lopez_____          Date: _8/15/07_
Sally Lopez
Director of Operations
Tax I.D. # 74-2091314

RECEIVED
APR 02 2007

8

37

## EXHIBIT A
## AGREEMENT BETWEEN
## SOUTHWEST MEDICAL PROVIDER NETWORK
## AND PARTICIPATING PROVIDER(S)

### Occupational Injury
### Reimbursement Schedule

Network Provider Group agrees to accept as payment in full for providing covered services to Network Patients amounts equal to **120%** of the current Medicare fee schedule and to accept **105%** reimbursement of fair and reasonable* for codes without a maximum allowable reimbursement specified by Medicare to include supplies. If Network Provider Group bills less than the amount allowed by the contractual agreement, then **100%** of the related charges will be paid and no further financial obligation shall exist on the part of the SouthWest Medical Provider Network.

* Fair and reasonable will be determined by experienced auditors using services, which require comparable resources and knowledge, as a benchmark for determining reimbursement amounts.

RECEIVED

APR 02 2007

GMI-SA

FROM PATIENTS CHOICE MAIN OFFICE (MON)AUG 10 2009 13:12 ST.13:12/No.5329630360

08/10/2009 10:51:52 AM -0500 SEDGWICK CMS

Sedgwick CMS

Sedgwick Claims Management Services, Inc.
SouthWest Medical Provider Network
417 NW Loop 410, Suite 800, San Antonio, Texas 78216
Telephone 210-561-0055 800-806-3795  Facsimile 210-348-4508

**AMENDMENT**
**Occupational Injury**

This amendment to the Provider or Provider Group Service Agreement currently in place between Sedgwick CMS dba SouthWest Medical Provider Network (hereinafter referred to as "Network") and _____ (hereinafter referred to as the "Provider or Network Provider Group") is hereby amended.

ARAM DAVTIAN, M.D.

Exhibit A of the SWMPN Provider or Provider Group Service Agreement shall be deleted in its entirety and replaced with the new Exhibit A attached hereto and made a part of this Amendment.

All other terms and conditions of the Agreement between Network and Network Provider or Provider Group remain in full force and unchanged by this Amendment. In the event there is any conflict between the terms and conditions of the Agreement and those of this Amendment, the rates, terms and conditions of this Amendment shall prevail.

By: Network Provider or Provider Group:          By: Sedgwick CMS dba SouthWest Medical Provider Network

Provider's Name (Please print)                   Saul Lopez, Operations Manager

ARAM DAVTIAN

Signature                                        Signature

Mailing Address                                  603 NW Loop 410, Ste 600
4401 S. Robinhood, Suite 100                    San Antonio, TX 78216
                TX. 75225

Tax ID: 431206534   Date: 8/10/09               Tax ID: 431205608   Date: 8-21-09

1

PAGE 3 OF 4

FROM PATENTS CHOICE MAIN OFFICE (MON)AUG 10 2009 15:12/ST 15:11/P/No. 6994600300 P 2



**Sedgwick CMS**

Sedgwick Claims Management Services, Inc.

**SouthWest Medical Provider Network**

613 NW Loop 410, Suite 600, San Antonio, Texas 78216
Telephone (210) 481-6055 (800) 800-3195 Facsimile (210) 349-8304

## EXHIBIT A

### Occupational Injury
### Reimbursement Schedule

Network Provider or Provider Group agrees to accept as payment in full for providing covered services to Network Patients amount equal to 85% of the current Division of Workers Comp. fee schedule and to accept 85% reimbursement of fair and reasonable" in cases without a reasonable fee schedule reimbursement specified by Medicare to include supplies. If Network Provider or Provider Group bills less than the amount allowed by the contractual agreement, then 100% of the reduced charge will be paid or, as further Sedgwick obligation shall exist on the part of Sedgwick CMS the SouthWest Medical Provider Network.

1. In accordance with the national fiscal fee of 85:00.
2. In case the Medicare procedure provided in code information, with Medicare rate of 85.
3. If fixed is a reasonable procedure applied or value rate. They are specified in procedures in order categorized.
   for service provided not billed, and not more common terms, if available.

In all specialty procedures or visits:

## NETWORK NOTICE
## SouthWest Medical Provider Network

<u>*To All Employees:*</u>

Your employer has chosen SouthWest Medical Provider Network (SWMPN) to provide health care if you are injured at work.  SouthWest Medical Provider Network Workers' Comp Network is a certified workers' compensation health care network. This network includes medical providers that have been chosen to treat your work related injuries. They are easy to access and dedicated to giving you quality care.  The following information will help you if you are injured at work.

- **If you are hurt at work and it is a life threatening emergency, you should go to the nearest emergency room.  If you are injured at work after normal business hours or while working outside your service area, you should go to the nearest care facility.**

The following applies if you are hurt at work and it is not an emergency.
- Tell your employer as soon as you can.
- Choose a treating doctor from the SWMPN service area where you live.
- If you are a member of a health maintenance organization (HMO) at the time you are injured, you have the right to choose your HMO primary care doctor as your treating doctor.  ***To do this, you must have chosen the doctor as your primary care doctor before your work related injury occurred.***  SouthWest Medical Provider Network will approve this choice if your HMO doctor agrees to abide by the terms of the network contract and comply with required laws.
- You must obtain all treatment and referrals for your injury from your treating doctor.
- Your treating doctor will be paid by your workers' compensation insurer and will not bill you for treatment.
- If you receive treatment for your injury from providers who are not in the SWMPN, you may have to pay for that care.
- Information about SWHCN is available by calling toll free 800-800-3795 or by email to HCNCoordinator@sedgwickcms.com. A list of SWHCN providers are posted at http://southwest.harborsys.com/southwest
- You may be required to get certain treatments approved in advance. Treatment that requires this is listed in your network information materials.  You may also request the list from your employer.
- If the doctor leaves the network and you have a life threatening condition or an acute condition you may continue to treat with a network doctor for 90 days.  This must be requested by the doctor.



EXHIBIT
B

41

SWHCN is certified in:

SWMPN is certified in Aransas, Atascosa, Bandera, Bee, Bexar, Blanco, Collin, Callaghan, Cameron, Comal, Dallas, Denton, El Paso, Fisher, Guadalupe, Harris, Hays, Hidalgo, Jones, Kendall, Kleberg, Live Oak, Medina, Nolan, Nueces, Refugio, Runnels, San Patricio, Shackelford, Tarrant, Taylor, Travis, Wilson, Williamson, parts of Brazoria (zip code 77578, 77581, 77584), Liberty (zip code 77328, 77535), Fort Bend (zip code 77053, 77441, 77459, 77469, 77471, 77477, 77478, 77479, 77493, 77494, 77545), Montgomery (zip code 77301, 77302, 77303, 77304, 77306, 77316, 77318, 77354, 77355, 77356, 77357, 77362, 77365, 77372, 77378, 77380, 77381, 77384 77385, 77386, 77387), Galveston (zip code 77546, 77573), Grimes (zip code 77363),   Walker (zip code 77358) Counties.



## Sedgwick Claims Management Services, Inc.

To:                Friedman & Feifer

Fax Number:        (972) 788-2667

From:              Navarro, Sarah O.

Fax Number:

Date:              November 03, 2014

Subject:           Advisory Panel Decision - SouthWest Medical Provider Network

Memo:

Dear Mr. Lawrence Friedman,

Attached is a faxed copy of Sedgwick's SouthWest Medical Provider Network Advisory Panel review, regarding the termination and non-renewal of the group agreement for Dr. Ara Dayian and Patients Choice Family Medicine and Rehabilitation.

A Carbon copy is being faxed to Mr. Robert Stokes of Flahive, Ogden and Latson, legal counsel for the SouthWest Medical Provider Network.

Thank you - SW HCN Staff
Sarah

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

***CONFIDENTIALITY NOTE***

The information contained in this facsimile message may be legally privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this telecopy is strictly prohibited. If you have received this telecopy in error, please notify us immediately by calling the number listed above and return the original message to us at the address above by the United States Postal Service.



EXHIBIT
C



sedgwick

dba

SouthWest Medical Provider Network

**9601 McAllister Freeway, Suite 500, San Antonio, Texas 78216 (800) 800-3795**

October 31, 2014

Ara Dayian, M.D.
Patients Choice Family Medicine and Rehab
4801 S Buckner Blvd., Suite 300
Dallas, TX 75227         Certified Mail: 7012 1640 0001 6354 4659

Re: Southwest Medical Provider Network, Provider Service Agreement

Dear Dr. Dayian,

Your appeal, submitted to us by legal counsel Friedman & Feiger, has been reviewed by the physician members serving on the Advisory Panel Quality Assurance Council. After careful consideration of the documents submitted for review, I regret to inform you that the recommendation of the council is to uphold the decision to terminate and not to renew your contract with Sedgwick's SouthWest Medical Provider Network.

In accordance with 28 Texas Administrative Code §10.42(b)(6)(A) the effective date of this decision is November 24, 2014.

A summary of the review follows:

The appeal package contained 10 SouthWest Medical Provider Network welcome letters for the following healthcare providers: Dr. Ara Dayian, Mike Watson JR Physical Therapist, Jill Sexton Occupational Therapist, Michelle L. Van Fossen Physician Assistant, Abigail Soto Physician Assitant, April A Parker Licensed Professional Counselor, Athena M Payne Chiropractor, Christalyn Burnham Chiropractor, Derrick T Abraham Physical Therapist and Jennifer N Choate Chiropractor.

Review of these letters compared to a roster e-mailed to Sedgwick on April 4, 2014 found that of those names, only Dr. Dayian, Ms. Parker, Mr. Watson, and Dr. Burnham still worked at your facility and were credentialed. A welcome letter for Physician Assistant Alexander Alba was not included as part of the appeal, but we are referencing him as a credentialed provider since he treats network participants and is currently credentialed. It appears that the other providers referenced in the appeal are no longer employed by Patients Choice. However a letter informing us of their termination from Patients Choice was never sent to the SouthWest Medical Provider Network as was required by the network.

In addition, on April 17, 2014, network staff requested 2 credentialing files; one for Brenda Davis, OTR and the other for Art Tarrango, EP. This request was directed to Mr. White. To date, neither of the 2 requested credentialing files have been sent, nor has the subsequent provider roster that Mr. White stated he was going to forward. On April 3, 2014, Mr. White asked for a month's delay in submitting the roster to us stating Patients Choice was in a transitional period with regard to provider staffing.

The Texas Administrative Code dictates specific credentialing requirements mandated by the Texas Department of Insurance, Division of Workers' Compensation to all certified workers' compensation networks. "The network shall credential all doctors and health care practitioners, including advanced practice nurses and physician assistants, if they are listed in the provider directory. A network shall credential each doctor and health care practitioner who is a member of a contracting group, such as an independent doctor association or medical group." 28 Texas Administrative Code §10.82; Referrals to out-of-network providers must be approved by the network. Texas Insurance Code § 1305.103(e)



sedgwick

dba

## SouthWest Medical Provider Network

### 9601 McAllister Freeway, Suite 500, San Antonio, Texas 78216 (800) 800-3795

The following healthcare providers listed on the e-mailed roster have never been credentialed to actively treat our network participants: Chris Poulsen Psychologist., Randy Gibson Licensed Professional Counselor, Brenda Davis Occupational Therapist, Art Tarrango "EP", Shaun Marek Chiropractor, Brian Narek Chiropractor, Fred Bauldwin Chiropractor, Andre Hwang Chiropractor, and Maria Camilla Rosas Chiropractor. Despite their not being credentialed by us, records indicate that they had been treating network patients at your facility.

Your appeal also references what is known as the Aranda Decision - a "Duty of Good Faith and Fair Dealing". Although the Texas Supreme Court overruled that decision on September 21, 2012, the SouthWest Medical Provider Network has completed a review of medical bills submitted by Patients Choice. It has been determined that all claims have been paid timely for Dr. Dayian and Patients Choice, *even bills for services rendered by non-credentialed providers*. The SouthWest Medical Provider Network has treated Patient's Choice with the utmost good faith.

In summary, all licensed Texas healthcare providers rendering care to injured workers covered by the network, must be credentialed before they can treat our claimants. Care provided by non-credentialed healthcare providers should not be provided unless the service has been approved by the Network. Our billing records indicate that repeatedly non credentialed providers at your facility have been treating network patients.

The last item noted and discussed at the meeting regarding your appeal was that Patients Choice primary treatment is physical rehabilitation services rendered to our network participants by Patients Choice Staff.

The SouthWest Medical Provider Network has an agreement with MedRisk to provide physical rehabilitation services to Clients participating in our SouthWest Medical Provider Network. Patients Choice also has a direct agreement with MedRisk to provide physical rehabilitation services to injured workers accessing MedRisk through the SouthWest Medical Provider Network. Patients Choice will continue to get SouthWest Medical Provider Network referrals through their agreement with MedRisk. These referrals will go directly to Patients Choice from MedRisk.

The decision to terminate and not renew Dr. Dayian's group contract with the SouthWest Medical Provider Network is an administrative decision and is based on the need of the network in your community. The decision to uphold the original non-renewal of your provider group contract is final.

We have appreciated the care you have provided to network patients and look forward to your continued care of them through your contractual agreement with MedRisk.

Sincerely,

V. Jane Derebery, M.D., FACOEM
Medical Director, SouthWest Medical Provider Network

CC: Friedman & Feiger, legal counsel for Ara Dayian M.D. and Patients Choice Family Medicine & Rehabilitation
CC: Robert Stokes, Flahive, Ogden and Latson, legal counsel for the SouthWest Medical Provider Network

## CAUSE NO. DC-14-13470

| | | |
|---|---|---|
| ARA R. DAYIAN, M.D. | § | IN THE DISTRICT COURT |
| Plaintiff(s) | § | |
| | § | |
| VS. | § | |
| | § | DALLAS COUNTY, TEXAS |
| SEDGWICK CLAIMS MANAGEMENT | § | |
| SERVICES, INC., D/B/A | § | |
| SOUTHWEST MEDICAL PROVIDER | § | |
| NETWORK | § | |
| Defendant(s) | § | 162ND JUDICIAL DISTRICT |

### SETTLEMENT AGREEMENT

1. _Ara Dayian, M.D.; Sedgwick Claims management_
   hereto agree to settle all claims and controversies between them, _Service, Inc. et al_
   asserted or assertable in this case.

2. The consideration to be given for this settlement is as follows:

   (a) _____N/A_____ shall receive the
   sum of $____N/A_____ U.S.
   dollars, on or before_____,
   which sum will be paid by the following parties in the
   amounts stated.

   _See Attachment 1_
   _____
   _____
   _____
   _____

3. The above-styled and numbered cause shall be resolved by:

   (a) ____✓____ ·an agreed order of dismissal with prejudice
   with costs taxed to _party incurring same_ or

   (b) _____ an agreed judgment providing as follows:
   _____
   _____
   _____
   _____

**EXHIBIT**
**D**

4.    The parties agree to release, discharge, and forever hold the other Harmless from any and all claims, demands or suits, unliquidated whether or not asserted in the above case, as of this date, arising from or related to the events and transactions which are the subject matter of this case.

The mutual release runs to the benefit of all attorneys, agents, employees, officers, directors, shareholders and partners of the parties. "Party" as used in this release includes all named parties to this case as well as _____

_____

_____, and all related entities of the parties, except _____

5.    Each signatory hereto warrants and represents:

(a)   ___X___        he or she has authority to bind the parties for whom this signatory acts.

(b)   _____        the claims, suits, rights and/or interests which are the subject matter hereto are owned by the party asserting same, have not been assigned, transferred or sold and are free of encumbrances.

6.    _____N/A_____ shall deliver drafts of settlement documents to the other parties on or before _____ _____. The parties agree to cooperate with each other in the drafting and execution of such additional documents as are reasonably requested or required to implement the terms and spirit of this agreement.

7.    If one or more disputes arise with regard to the interpretation and/or performances of this agreement or any of its provisions, the parties agree to attempt to resolve same by phone conference with the mediator who facilitated this settlement. If the parties cannot resolve their difference by phone conference, then each agrees to schedule one day of mediation with the mediator within thirty (30) days to resolve the disputes and to share the costs of same equally. If a party refuses to mediate, then that party may not recover attorney's fees or costs in any litigation brought to construe or enforce this agreement. Otherwise, if mediation is unsuccessful,

then the prevailing party or parties shall be entitled to recover reasonable attorney's fees and expenses, including the cost of the unsuccessful mediation. The parties hereto and their attorneys recognize and agree that under no circumstances will the mediator be a fact witness regarding the interpretation of this agreement.

8.  Other terms of this settlement are _see Attachment 1_

9.  This agreement is made and performable in _Dallas_ County, Texas and shall be construed in accordance with the laws of the State of Texas.

10. Each signatory to this settlement has entered into same freely and without duress after having consulted with professionals of his or her choice. Each party hereto has been advised by the mediator that the mediator is not the attorney for any party and that each party should have this agreement reviewed by that party's attorney prior to executing same.

11. Notwithstanding any handwritten or other contrary provisions, the parties intend to be immediately bound by this settlement agreement. The parties stipulate to all facts necessary for the Court to render judgment on this settlement agreement for which the parties waive all requirements of pleadings and summary judgment motion procedure and stipulate to the entry of judgment hereon. Only modifications in writing, signed by all parties and their counsel, if any, shall be enforceable. Disputes about this agreement shall be submitted to mediation.

**SIGNED** this _9th_ day of _December_, 2014.

**PLAINTIFFS:**

_____

_____

_____

_____

**APPROVED BY:**
**ATTORNEY FOR PLAINTIFFS**

_____

**OTHER PARTIES:**

_____

_____

_____

_____

**APPROVED BY:**
**ATTORNEY FOR**

_____

**DEFENDANTS:**

_____

_____

_____

_____

**APPROVED BY:**
**ATTORNEY FOR DEFENDANTS**

_____

_____

_____

_____

**APPROVED BY:**
**ATTORNEY FOR**

_____

## ATTACHMENT 1

1.   Dr. Dayian shall sign a new group contract individually and on behalf of Buckner Family Medical Association, P.A. d/b/a Patients Choice.

2.   Dr. Dayian shall provide complete credentialing packets for all licensed health care providers employed by Buckner Family Medical Association, P.A. d/b/a Patients Choice to the network within 10 business days.   Dr. Dayian or his staff will work diligently with the network's credentialing staff to resolve any issues concerning the credentialing packets or process.   The parties will work in good faith to have all credentialing packets comply with the network's policies and procedures. The network will submit credentialing packets that comply with the network's policies and procedures to the credentialing committee for approval on January 21, 2015.   By January 23, 2015, the network will approve, if appropriate, the new group contract and credentialing packets.

3.   Per the TRO, Dr. Dayian and the network provider group will not treat any new network patients until number 2 above is complete.   However, pending completion of number 2 above, in the event a new network patient does present himself to Dr. Dayian, ONLY Dr. Dayian may be the treating physician of the network patient.   If medically necessary, Dr. Dayian may refer the network patient to Mike Watson for physical therapy.   Dr. Dayian has not been removed from the network provider

directory and will not be removed pending completion of number 2 above.

4.    Dr. Dayian shall make himself available for peer-to-peer inquiries or another appropriately licensed health care provider must be made available.    Dr. Dayian shall assign a point of contact person for direct phone call matter and other communications with the network.

5.    Group rosters are to be sent monthly with credentialing documents of any new providers or termination of any providers.

6.    Any network complaints are to be addressed by Dr. Dayian and Dr. Derebery which would be a medical director to medical director discussion.

Exhibit A



## sedgwick

**Sedgwick Claims Management Services, Inc. dba**
**SouthWest Medical Provider Network**

**Provider Group Agreement**
**Occupational Injury**

This Agreement is made this ____ day of ____ March ____, 20 ___ by and between
Sedgwick CMS dba SouthWest Medical Provider Network, (hereinafter referred to as the "Network") and
<u>Ara R. Dayian, M.D. and Buckner Family Medical Association, P.A. dba Patients Choice Family</u>
<u>Medicine and Rehab</u> (hereinafter referred to as the "Network Provider ").

WHEREAS, the Network is a Texas for-profit corporation organized for the purpose of
arranging for the provision of health care to employer groups, insurers, and other payers in a timely and
efficient manner consistent with good medical practice; and

WHEREAS, the Network will from time to time enter into contracts with employer groups,
insurers, and other payers for the provision of health care services, the Network does not practice
medicine in any form and is not responsible for patient outcomes as a result of its contractual agreement
with Network Provider . The Network Administration shall not attempt, directly or indirectly, to control,
direct or interfere with the practice of medicine by any Network Provider; nor shall the Network
Administration authorize such control, direction or interference by any other party; and

WHEREAS, the Network Provider desires to provide quality and cost-effective health care
services to individual participants in health benefit programs (hereinafter referred to as "Network
Patients") of employer groups, insurers, and other payers under contract with the Network;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth
herein, the parties agree as follows:

I.     **DEFINITIONS**

When used in this Agreement and unless the content otherwise clearly requires, the following
words and terms shall mean:

1.1     COVERED SERVICES:

Medical services that are authorized for payment under the employer's, insurer or payer's
occupational injury program.

1.2     NETWORK FACILITIES:

Any health care facility including but not limited to ambulatory surgical centers, acute
care hospitals, nursing homes, outpatient clinics, or other facility providing health care
to Network Patients.

1.3     NETWORK GOVERNING BOARD:

The Quality Committee of SouthWest Medical Provider Network.

**RECEIVED**

DEC 2 3 2014

SWMPN – Group Agreement
Revised – 10/7/2014



**EXHIBIT**
**E**



### sedgwick

**Sedgwick Claims Management Services, Inc. dba**
**SouthWest Medical Provider Network**

1.4     NETWORK ADMINSTRATION:

The Operating team responsible for the day to day operations of the Health Care Network

1.5     NETWORK HOSPITAL:

A licensed hospital in the State of Texas that has contracted with the Network to render covered Services to Network Patients.

1.6     NETWORK UTILIZATION REVIEW COMMITTEE:

A group appointed by the Network to ensure that the qualifications of the applicants are evaluated objectively.

1.7     NETWORK PROVIDER

Any health care provider or practitioner licensed to practice in the State of Texas who has contracted with the Network to render Covered Services to Network Patients.

1.8     TREATING NETWORK PROVIDER

A provider licensed to practice in the State of Texas whose specialty is Family Practice, General Practice, Internal Medicine, Occupational Medicine, Nurse Practitioner (Family/General, Occupational Medicine setting), Physician Assistant (Family/General, Occupational Medicine setting) has been designated by the Network as a treating doctor.

## II.     NETWORK PROVIDER RESPONSIBILITIES

2.1     The Network Provider agrees to follow treatment guidelines, return-to-work guidelines and individual treatment protocols adopted by the Network pursuant to 10.405 of Subchapter C – Contracting from the Workers' Compensation Health Care Network Rules posted by TDI (relating to Guidelines and Protocols), as applicable to an employee's injury. TAC §10.42 (b)(2) The Network Provider further agrees to comply with any additional policies and procedures including but not limited to: Network Quality Improvement Requirements, Utilization Review, Peer Review, Grievance Procedures, and all Credentialing and Re-Credentialing procedures required by the Network.

2.2     The Network Provider agrees to accept as payment in full for providing Covered Services to Network Patients reimbursement of the total covered services as specified in Attachment A (Occupational Injury, Reimbursement Schedule) TAC §10.42 (b)(11) and will not bill the Network Patient or attempt to collect any amounts of payment from an Network Patient for health care services for compensable injuries under any

RECEIVED

DEC 2 3 2014



### sedgwick

**Sedgwick Claims Management Services, Inc. dba**
**SouthWest Medical Provider Network**

circumstances, including the insolvency of the insurance carrier, employer or the Network. **TAC §10.42 (b)(1)**

2.3     The Network Provider, whose specialty has been designated by the Network as a treating doctor, per section 1.7, agrees to be a Network Treating Doctor and, if so, any additional provisions applicable to the Network Provider. **TAC §10.42 (b)(12)**

2.4     The Network Provider whose specialty has been designated by the Network as a treating doctor and/or specialist in the Network must be available 24 hours per day, seven days per week within the Network's service area. Availability may be established by telephone answering service, pager, or indirectly by telephone. The Network Provider may direct employees to urgent care centers or emergency rooms if the Network Provider judges such sites to be the appropriate location for care pursuant to Insurance Code §1305.302(b).

2.5     Billing by and payment to the Network Provider will be made in accordance with Labor Code 408.027 and other applicable statutes and rules. **TAC §10.42 (b)(13)**

2.6     When submitting claim forms for Network Patients, the Network Provider agrees to use appropriate procedure codes and HCFA forms to identify services rendered to Network Patients as defined by the standards of CPT-4 and ICD-9-CM, or other procedure coding systems utilized by the Network.

2.7     The Network Provider agrees to maintain a current license to practice in the State of Texas and agrees to render Covered Services to Network Patients.

2.8     The Network Provider agrees to allow the Network to list the Network Provider's name, address and phone number in a directory of Network Providers to help promote the Network with employer groups, insurers, and other payers. Any other use of Network Provider's name requires prior approval by Network Provider.

2.9     The Network Provider agrees to carry either occurrence-based or claims-made general and professional liability insurance at the Network Provider's expense in an amount that is normally required, to cover claims made by Network Patients or others in connection with the performance of any part of this Agreement. The Network Provider will furnish the Network with the name of the Network Provider's insurance carrier and agrees that the Network may confirm such insurance coverage is adequate and in force through the term of this Agreement. The Network Provider will allow the Network access to the insurance carrier data and information on the Network Provider's medical malpractice history including the number, type, nature, and disposition of claims filed against the Network Provider. The Network Provider will notify the Network promptly whenever a Network Patient files a claim or a notice of intent to commence action against the Network Provider.

RECEIVED

DEC 2 3 2014



**sedgwick**

## Sedgwick Claims Management Services, Inc. dba
## SouthWest Medical Provider Network

2.10   The Network Provider understands and agrees that, in the provision of medical care services under the Agreement, the Network Provider acts as an independent contractor and not as an employee or agent of the Network.

2.11   Nothing in the Agreement shall be construed to restrict the Network Provider from entering into other contracts or agreements to provide health care services to other health care delivery plans, patients, or employer groups.

2.12   Network Provider agrees to post in the office of Network Provider a notice to employees on the process for resolving worker's compensation health care Network complaints in accordance with Insurance Code §1305.405. The notice must include the department's toll-free telephone number for filing a complaint and must list all workers' compensation health care networks with which the Network Provider contracts. **TAC §10.42 (b)(7)**

2.13   The contract and any subcontract within the Provider Network shall not be interpreted to involve a transfer of risk as defined under Insurance Code §1305.004(a)(26). **TAC §10.42(b)(9)**

2.14   The Network Provider and any subcontracting provider within the Network must comply with all applicable statutory and regulatory requirements under federal and state law. **TAC §10.42 (b)(10)**

2.15   The Network agrees to furnish to the Network Provider and the Network Provider agrees to abide by the list of any treatments and services that require the Network's preauthorization and any procedures to obtain preauthorization. **TAC§10.42(b)(8)**

2.16   The Network Provider specifically agrees to provide treatment for injured employees who obtain workers' compensation health care services through the Network that is specifically identified in the contract as a contracting party. **TAC §10.42 (b)(14)**

2.17   A treating doctor shall provide health care to the employee for the employee's compensable injury and shall make referrals to other Network providers, or request referrals to out-of-network providers if medically necessary services are not available within the network. Referrals to out-of-network providers must be approved by the Network. The Network shall approve a referral to an out-of-network provider not later than the seventh day after the date on which the referral is requested, or sooner if circumstances and the condition of the employee require expedited approval. If the Network denies the referral request, the employee may appeal the decision through the network's complaint process under Subchapter I. TIC § 1305.103(e)

2.18   The treating doctor shall participate in the medical case management process as required by the network, including participation in return-to-work planning. TIC § 1305.103(f)

RECEIVED

DEC 2 3 2014



**sedgwick**

## Sedgwick Claims Management Services, Inc. dba
## SouthWest Medical Provider Network

---

### III.   NETWORK RESPONSIBILITIES

3.1   The Network is not required to accept an application for participation in the Network from a health care provider that otherwise meets the requirements specified in this chapter if the network determines that the network has contracted with a sufficient number of qualified health care providers, including health care providers of the same license type or specialty. **TAC §10.42(a)**

3.2   The Network agrees to contract with employer groups, insurers and other payers and will strive that such groups pay the Network Provider's occupational injury claims promptly within forty five (45) or fewer calendar days of receipt of the Network Provider's billing for Covered Services rendered to Network Patients.

3.3   The Network agrees to perform or arrange for the performance of such administrative, accounting, and other related functions necessary to implement and operate the Network.

3.4   The Network agrees to provide Network Provider with a toll free number to assist Network Provider in verifying the status of Network Patient.

3.5   The Network agrees to market the Network to and enter into contracts with employer groups, insurers, other payers and claims administrators.

3.6   The Network agrees to use its best efforts to contract with sufficient Network Providers and Network Facilities to allow the Network Patients reasonable access to appropriate medical services within the service area.

3.7   The Network agrees to describe to employer groups, insurers, and other payers the terms and conditions under which the Network Provider will provide health care services as a participating Network Provider of the Network

3.8   The Network agrees to furnish to the Network Provider, and the Network Provider agrees to abide by, the list of any treatments and services that require preauthorization and any procedures to obtain preauthorization. **TAC §10.42 (b)(8)**

3.9   The contract and any subcontract within the Network shall not be interpreted to involve a transfer of risk as defined under Insurance Code §1305.004(a)(26). **TAC §10.42 (b)(9)**

3.10   The Network shall not use any financial incentive or make a payment to a health care provider that acts directly or indirectly as an inducement to limit medically necessary services. The adoption of treatment guidelines, return to work guidelines and individual

RECEIVED

DEC 2 3 2014



**sedgwick**

**Sedgwick Claims Management Services, Inc. dba
SouthWest Medical Provider Network**

treatment protocols by a network under Insurance Code §1305.304 and §10.83(a) of this chapter (relating to Guidelines and Protocols) is not a violation of this section. **TAC §10.42 (c)**

3.11   An insurance carrier or Network must provide written notice to a Network Provider or group of Network Providers before the carrier or Network conducts economic profiling, including utilization management studies comparing the Network Provider to other providers, or other profiling of the Network Provider or group of Network Providers. **TAC §10.42(d)**

3.12   The insurance carrier or Network may not deny treatment solely on the basis that a treatment for a compensable injury in question is not specifically addressed by the treatment guidelines used by the insurance carrier or Network. **TAC §10.42 (b)(3)**

3.13   The Network will not engage in retaliatory action, including termination of or refusal to renew a contract, against a Network Provider because the Network Provider has, on behalf of an employee, reasonably filed a complaint against, or appealed a decision of the Network or requested reconsideration or independent review of an adverse determination. **TAC §10.42(b)(4)**

**IV.   TERM AND TERMINATION**

4.1   The term of the Agreement is for one (1) year, and will not automatically renew. This agreement will expire at the end of the term if either party gives notice of non-renewal at least 90 days before the end of the term. The Network shall be able to terminate this Agreement at any time by providing the Network Provider with at least ninety (90) calendar day notice of its intent to terminate this Agreement. Notice provided by the Network pursuant to this Section shall clearly state the ending date ("End Date") of this Agreement. In the event the End Date coincides with the natural, one year expiration of this Agreement, this Agreement shall be deemed to have expired naturally, without renewal.

If Network Provider is removed from the Network due to non-renewal or expiration of this Agreement, Network Provider is not entitled to challenge the non-renewal or expiration under the appeal process set forth in section below or the dispute resolution procedures set forth below.

If Provider is terminated from the Network due to the expiration of this Agreement, Provider is not entitled to challenge that termination under the appeal process set forth in section below or the dispute resolution procedures set forth below.

RECEIVED

DEC 2 3 2014



## sedgwick

### Sedgwick Claims Management Services, Inc. dba
### SouthWest Medical Provider Network

**V.     GENERAL**

5.1     This Agreement shall be binding and benefit upon and shall inure to the benefit of the successors and assigns of the respective parties hereto. Each party agrees that it will not assign this Agreement without the prior written consent of the other party. Such consent shall not be unreasonably withheld.

5.2     The section headings used herein have been inserted for convenience of reference only and shall not in any way modify or restrict any of the terms or provisions hereof.

5.3     Confidentiality - Each party shall be subject to all applicable laws and regulations concerning confidentiality of patient medical records and confidentiality of Network reimbursement schedule.

5.4     Indemnification - Each party agrees that the other party, and its respective directors, employees, agents, subsidiaries, and successors and assigns shall not be liable for any awards, lawsuit damages, penalties, specific performance obligations, costs, expenses, or any other losses or obligations of any kind related to the other party's obligations herein, and each party shall indemnify and hold harmless the other party from and against any and all losses, claims, causes of action, actions, liabilities, damages, costs and expenses (including without limitation reasonable legal fees), arising from or caused by that party's failure to meet its obligations hereunder, negligence or misconduct.

5.5     Independent Contractor - None of the provisions of this Agreement are intended to create, nor be construed to create, any relationship between either parties other than that of independent contractors contracting with each other solely for the purpose of carrying out the provisions of this Agreement. Neither of the parties hereto nor any of their respective trustees, officers, employees, consultants, attorneys, accountants, administrative officers, or agents shall be construed to be the agent or employee of the other.

5.6     Governing Law - This agreement shall be deemed to have been executed in Texas and shall be construed and enforced in accordance with the laws of the State of Texas without giving effect to principles of conflict of laws.

5.7     Waiver - The failure of any party to this Agreement to object to, or take affirmative action with respect to, any conduct of the other which is in violation of the terms of this Agreement shall not be construed as a waiver thereof or of any future breach or subsequent wrongful conduct.

5.8     Entire Agreement - This agreement, including any attached Exhibits, constitutes the entire understanding between the parties concerning its subject matter. All prior negotiations and agreements of the parties with respect to any of the duties and obligations set forth in this agreement are merged into this agreement.

**RECEIVED**

**DEC 2 3 2014**



**sedgwick**

## Sedgwick Claims Management Services, Inc. dba
## SouthWest Medical Provider Network

**ATTACHMENT A**
**Provider Service Agreement**
**Reimbursement for Occupational Injury Services**

I.   **REIMBURSEMENT**

    A.   **Reimbursement Rules**

        Network Provider agrees to accept as payment in full for providing covered services to Network patients amounts equal to (eighty-five percent) **85%** of the current (DWC) Division of Workers Comp. fee schedule and to accept (eighty percent) **80%** reimbursement of fair and reasonable* for codes without a maximum allowable reimbursement specified by Medicare to include supplies. If Network Provider bills less than the amount allowed by the contractual agreement, then (one-hundred percent) **100%** of the related charges will be paid and no further financial obligation shall exist on the part of the SouthWest Medical Provider Network.

*Fair and reasonable reimbursement shall:

1. be consistent with the criteria of Labor Code §413.011;
2. ensure that similar procedures provided in similar circumstances receive similar reimbursement; and
3. be based on nationally recognized published studies, published Division medical dispute decisions, and/or values assigned for services involving similar work and resource commitments, if available

**RECEIVED**

**DEC 2 3 2014**



## sedgwick

### Sedgwick Claims Management Services, Inc. dba
### SouthWest Medical Provider Network

Executed this ~~17~~ 18th day of ~~December~~ March, 20 ~~14~~ 15

**Buckner Family Medical Association, P.A.**
**d/b/a Patients Choice Family Medicine and Rehab** (Network Provider)

By: _____

Its: _____

Ara R. Dayian, M.D.   *Ara Dayian MD*
Provider's Name (Please Print)

*4801 South Buckner Blvd Ste 200*
Mailing Address

*Dallas TX. 75227*
City, State, Zip

Tax I.D. # *412109 354*   Date: *12/17/14*

Tax I.D. #_____   Date: _____

Tax I.D. #_____   Date: _____

By:   Sedgwick CMS dba SouthWest Medical Provider Network

*Slopy*   Date: *3-18-15*
Sally Lopez
Manager, Network Products
Tax I.D. # 362685608

SWMPN – Group Agreement
Revised – 10/7/2014

RECEIVED
DEC 2 3 2014